OPINION OF THE COURT
Megan Tallmer, J.
The above-captioned cases are joined together for decision. The five named petitioners seek to be relieved of the obligation to register as sex offenders pursuant to the Sex Offender Registration Act[1] (hereinafter referred to as SORA). Each petitioner claims that SORA is unconstitutional as applied to him.[2] The People oppose petitioners’ applications for exemption from the registration requirements of SORA. The New York State Attorney General’s office was notified of the Jackson and Cintron motions and declined to take a position.
The Facts
Eliezer Cintron was convicted of criminal possession of cocaine, unlawful imprisonment, endangering the welfare of a child and misdemeanor assault. He kept his girlfriend and her two children prisoners in her apartment. Although no sexual behavior was alleged, unlawful imprisonment of a child by a nonparent is one of the crimes subject to SORA.[3]
Nelson Cordero was convicted of burglary in the first degree and unlawful imprisonment in the second degree. He broke into the home of his former common-law wife. After forcing his son and another 15-year-old boy into the bathroom, Cordero tied up the 15-year-old boy with wire rope. There was no allegation that the boy was harmed sexually in any way, but Cordero is considered a “sex offender” for SORA purposes.
Dwayne Glover was convicted of attempted murder in the second degree, robbery in the first degree and unlawful *835 imprisonment in the first degree. He entered an apartment armed with a loaded gun and imprisoned the occupants for about seven hours. Present in the apartment were two women, a 12-year-old girl and a six-year-old boy. Glover directed all of them to lie on the bedroom floor. No sexual contact was alleged but unlawful imprisonment of a minor by a nonparent requires registration under SORA.
Marko Ivesic pleaded guilty to kidnapping in the second degree and unlawful imprisonment in the first degree. He broke into the home of his brother-in-law, with whom his estranged wife was living. When Ivesic’s wife, her sister and three children arrived home, he pointed a loaded shotgun at them, handcuffed his wife and made her lie face down on the floor. He told her that he intended to kill the entire family. He also pointed the shotgun at his brother-in-law and his niece. Ivesic had no sexual contact with any of the seven people he held at gunpoint, but both kidnapping in the second degree[4] and unlawful imprisonment of a minor by a nonparent require registration under SORA.
Francis Jackson was convicted of promoting prostitution in the second degree and attempted kidnapping in the second degree. Jackson and his girlfriend forced two women to engage in prostitution over the course of several days. He kidnapped the son of one of the women to compel her to continue prostituting herself. There was no claim that Jackson either perpetrated or intended to commit any kind of sexual misconduct upon the child. However, attempted kidnapping in the second degree of a child by a nonparent is included in SORA’s definition of “sex offense.”
The Law
A. The Jacob Wetterling Act
In 1989, Jacob Wetterling, an 11-year-old boy, was riding his bike home with his brother Trevor and a friend named Aaron. A masked man with a gun approached and ordered the boys to lie face down on the ground. The man asked each of the boys their age. After they responded, the man told Trevor and Aaron to run into the woods and not look back or they would be shot. When Aaron and Trevor glanced back, they saw the masked man grab Jacob’s arm. Once they reached the wooded area, they turned to find that Jacob and the man were gone. Jacob Wetterling has never been found.
*836 In response to their son’s kidnapping, Jacob’s parents formed the Jacob Wetterling Foundation, an advocacy group for children’s safety. The Foundation’s mission, stated on its Web site,[5] is to protect children from sexual exploitation and abduction. In 1994, the Wetterlings, along with other interested individuals and groups, successfully lobbied Congress to pass what is commonly known as “the Jacob Wetterling Act” (hereinafter referred to as JWA).[6]
The objectives of JWA are set out in a report of the Committee on the Judiciary to the House of Representatives:
“To address crimes of violence and molestation . . . against children in the United States, H.R. 324 requires the Attorney General to establish guidelines for State programs that require any person convicted of such crimes to register a current address with a designated State law enforcement agency for ten years after release from prison or being placed on parole, supervised release or probation. The bill sets forth requirements to an approved State registration program. . . .
“Each State has three years from the date of enactment to comply with the guidelines established by the Attorney General. The allocation of [federal] funds . . . received by a State not in compliance with such guidelines within that time period may be reduced by ten percent, and those unallocated funds reallocated to the States in compliance with the guidelines. . . .
“The Committee believes that protection of children from violence and sex offenses falls clearly within the Federal government’s purview in protecting the health, safety and welfare of its citizens. The guidelines created in this bill serve a legitimate Federal governmental purpose.” (HR Rep No. 103-392, 103rd Cong, 1st Sess, reprinted in 1993 WL 484758.)
JWA requires every state to adopt a registration program for sexual predators, sexually violent offenders and persons *837 convicted of a criminal offense against a minor. “[C]riminal offense against a victim who is a minor” is defined to mean any offense specified by state law comparable to kidnapping or false imprisonment of a minor, other than by a parent. (42 USC § 14071 [a] [3] [A] [i], [ii].)
JWA directs the Attorney General to establish guidelines for state programs implementing the provisions of the law. Those guidelines, adopted in 1996, provide:
“The specific clauses in the definition of ‘criminal offense against a victim who is a minor’ are as follows:
“(1) Clauses (i) and (ii) cover kidnaping of a minor (except by a parent) and false imprisonment of a minor (except by a parent). All states have statutes that define offenses — going by such names as ‘kidnapping,’ ‘criminal restraint,’ or ‘false imprisonment’ — whose gravamen is abduction or unlawful restraint of a person. States can comply with these clauses by requiring registration for persons convicted of these statutory offenses whose victims were below the age of 18.” (Final Guidelines for the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, 61 Fed Reg 15110, 15113 [1996], reprinted in 1996 WL 153812.)[7]
JWA and the federal guidelines adopted pursuant to JWA thus mandate that kidnapping and unlawful imprisonment of a minor by a nonparent be included in any state registration program. The guidelines further provide that although states are free to make other offenses subject to registration, they must at least incorporate the offenses designated in JWA. (61 Fed Reg at 15112, reprinted in 1996 WL 153812.)
B. SORA
SORA was passed by the New York Legislature in 1995 and became effective January 21, 1996. Section 1 of the law enacting SORA, entitled “Legislative purpose or findings,” states:
“The system of registering sex offenders is a proper exercise of the state’s police power regulating present and ongoing conduct. Registration will provide law enforcement with additional information critical to preventing sexual victimization and to resolving incidents involving sexual abuse and exploita *838 tion promptly. It will allow them to alert the public when necessary for the continued protection of the community. . . .
“Therefore, this state’s policy, which will bring the state into compliance with the federal crime control act ... is to assist local law enforcement agencies’ efforts to protect their communities by requiring sex offenders to register and to authorize the release of necessary and relevant information about certain sex offenders to the public as provided in this act.” (L 1995, ch 192, § 1.)
In accordance with the Legislature’s intent to comply with JWA’s mandate, SORA defines “sex offense” to include conviction of or an attempt to commit unlawful imprisonment (Penal Law §§ 135.05, 135.10) and kidnapping (Penal Law §§ 135.20, 135.25) where the victim is less than 17 and defendant is not the victim’s parent (Correction Law § 168-a [2] [a] [i]). Sexual contact or motivation is not an element of these crimes.[8]
SORA provides three levels of registration and notification depending on the risk of reoffending. Level one, the lowest level, requires local law enforcement to be notified of an offender’s whereabouts (Correction Law § 168-l [6] [a]). Level two is assigned to sex offenders with a moderate risk of committing another sex offense. It allows local law enforcement agencies to disseminate information about an offender to any entity with a vulnerable population. Those entities, in turn, may disclose such information at their discretion. The information includes the name and photograph of the offender, his approximate address and the address of any institution of higher education he attends (Correction Law § 168-l [6] [b]).
The third and highest level applies to individuals with a high risk of reoffending. It provides for disclosure of the same information applicable to level two offenders, with the addition of the offender’s exact address, place of employment and name of his school (Correction Law § 168-Z [6] [c]). Information as to all sex offenders is available to the public via a toll-free number and on the Internet as to level three offenders.
Level one and two offenders previously were required to register annually for 10 years with the Division of Criminal Justice *839 Services. As of January 2006, level one offenders are subject to a registration period of 20 years and level two offenders are subject to lifetime registration.[9] Level three offenders and offenders designated as sexual predators, sexually violent offenders or predicate sex offenders must register annually for life.
The Second Circuit has upheld the constitutionality of SORA, rejecting arguments that it imposes ex post facto punishment for past offenses. (Doe v Pataki, 120 F3d 1263, 1284-1285 [1997].) The court reasoned that SORA is civil in nature and that its provisions therefore may be imposed retroactively upon past convictions for sex offenses. (See also Smith v Doe, 538 US 84 [2003] [rejecting claim that retroactive application of Alaska’s sex offender statute violates the Ex Post Facto Clause].)
C. New York Lower Court Cases
There is no New York appellate authority with respect to the constitutionality of SORA as applied to defendants convicted of kidnapping or unlawful imprisonment of a minor where there is no evidence of sexual abuse. Two lower court cases have considered the issue. In People v Bell (3 Misc 3d 773 [Sup Ct, Bronx County 2003, Price, J.]), defendant was convicted of kidnapping in the first degree. Defendant and two cohorts attempted to rob a man outside of the man’s apartment. The victim was able to retreat into his apartment but left his three-year-old daughter outside. Defendant took the child to blackmail the victim but the blackmail scheme failed and the child was returned unharmed.
The court acknowledged that, in general, governmental action will survive constitutional scrutiny if it bears a rational relationship to a legitimate governmental objective. It determined, however, that SORA is subject to the higher standard of strict scrutiny because it implicates fundamental rights. The rights identified by Bell as fundamental were defendant’s right to be free from damage to his reputation, potential loss of employment and special conditions of his parole dictated by his sex offender status. Under strict scrutiny analysis, there must be a compelling state interest to justify subjecting defendant to SORA.
Applying the strict scrutiny standard, the court concluded that requiring Bell to register as a sex offender was completely *840 arbitrary and unreasonable, with no substantial relation to the public policy underlying SORA. (Id. at 786.) The court rejected the People’s argument that there is a rational basis for connecting kidnapping to sex crimes, observing that “kidnapping does not have a strong link to sexual abuse, although it certainly may be an element in certain sexually motivated attacks.” (Id. at 782.)
In concluding that there is no rational relationship between the interests served by SORA and requiring Bell to register as a sex offender, the court accepted defendant’s argument that “the New York State Legislature chose to adopt only the sex crimes component of the [JWA], and it did so without any reference to the [JWA’s] more general ‘crimes against children’ component” (id. at 788). It is not clear from the opinion how the court reached this conclusion with respect to the Legislature’s intention.
Having found that SORA was unconstitutional as applied, the Bell court went on to prescribe a procedure for future claims of unconstitutionality:
“Conviction of any crime where classification under SORA is mandatory but no element of the crime itself involves an improper sexual component requires a hearing, at which there must be presented evidence of some sexual facet to the defendant’s actions or motivations sufficient to sustain a classification as a sexual offender. ... By finding the statute to be unconstitutional as applied, it is this court’s judgment that hereafter it should be left to the discretion of the courts, on an individual basis, to make an appropriate determination. In other words, whenever a defendant, who is convicted of a registerable offense that does not in and of itself contain a sexual component, challenges his being subjected to the SORA, the court will hold a hearing to determine if there is a rational basis for doing so. If a rational basis is so found, the court should then proceed to apply strict scrutiny to the specific application of the statute to [the] defendant” (3 Misc 3d at 789).
The other New York lower court case that has considered whether SORA is unconstitutional as applied is People v Wing Dong Moi (8 Misc 3d 1012[A], 2005 NY Slip Op 51068[U] [Westchester County Ct 2005, Bellantoni, J.]). There, defendant and several members of a gang forced two members of a rival gang *841 into a car. Defendant did not accompany the victims in the vehicle. The victims were shot and killed and defendant was convicted of kidnapping. It was uncontested that there was no sexual element to the crime of which defendant was convicted, nor any allegation of sexual abuse.
Disagreeing with Bell, Moi rejected defendant’s argument that SORA must be analyzed under the strict scrutiny test because it implicates fundamental rights. After determining that the constitutionality of SORA rather should be judged according to the rational relationship test, Moi discussed the legislative history of SORA. Relying upon letters and memoranda found in the Bill Jacket, the court concluded that SORA only was intended to regulate sexual offenders and not felony offenders in general. The court found that “society is in no better position to protect itself from sex offenders if Defendant registers as a level three sex offender, when the crime for which Defendant was convicted has no sexual element.” (8 Misc 3d 1012[A], 2005 NY Slip Op 51068[U], *13.)
As in Bell, the court set out a procedure for determining when persons convicted of kidnapping or unlawful imprisonment of a minor should be subject to SORA:
“In each individual case where a defendant claims his/her registration under SORA violates a constitutional right, the court must take into consideration any and all facts and circumstances, and all logical conclusions that could be drawn therefrom, in determining whether factors exist that create a rational basis for the application of SORA’s kidnapping provision to that particular defendant . . . the court has recognized a presumption of legitimacy in that provision of New York’s Sex Offender Registration Act requiring those convicted of certain kidnapping offenses to register as sex offenders, which presumption may be rebutted, where, as here, a defendant can demonstrate through reliable evidence that there is no rational basis for having the statute apply to him/her, and the People then fail to establish a rational basis for having the statute apply to said defendant.” (8 Misc 3d 1012[A], 2005 NY Slip Op 51068[U], *14.)
Neither Bell nor Moi appears to have considered JWA’s provision that any state program must include kidnapping and unlawful imprisonment of a minor by a nonparent within the sex offenses subject to registration and notification.
*842 D. The Correct Standard for Determining the Constitutionality of SORA
Initially, the court agrees with People v Wing Dong Moi that because SORA does not implicate any fundamental rights, its constitutionality should not be judged under the strict scrutiny test. Many other courts have reached the same conclusion with respect to similar sex offender statutes. (See Doe v Tandeske, 361 F3d 594 [9th Cir 2004]; State v Druktenis, 135 NM 223, 249-252, 86 P3d 1050, 1076-1079 [2004]; Gunderson v Hvass, 339 F3d 639, 643 [8th Cir 2003]; Akella v Michigan Dept. of State Police, 67 F Supp 2d 716, 727-731 [ED Mich 1999]; Lanni v Engler, 994 F Supp 849, 856 [ED Mich 1998]; Doe v Weld, 954 F Supp 425, 436 [D Mass 1996].)
The rights petitioners claim are fundamental are the liberty interests associated with the stigma of being labeled as sex offenders, the limiting of employment opportunities and the possibility of public disclosure of their status. Petitioners further assert an interest in not being subject to the special conditions of parole that attach to sex offenders.
No one disputes that the application of SORA to a defendant affects his liberty interests, such that defendant must be given notice and an opportunity to be heard before he may be deprived of that interest. (People v David W., 95 NY2d 130 [2000].) As Moi observes, however, the fact that a liberty interest triggers the protection of procedural due process does not mean that a fundamental right is implicated for purposes of substantive due process. (Wing Dong Moi, 8 Misc 3d 1012[A], 2005 NY Slip Op 51068[U], *8, citing Immediato v Rye Neck School Dist., 73 F3d 454, 463 [2d Cir 1996].)
The Court of Appeals recently rejected the argument that the right to marry a person of the same sex is a fundamental right requiring strict scrutiny of any legislation affecting that right. (Hernandez v Robles, 7 NY3d 338 [2006].) Although appellants identified 316 benefits of marriage under New York law, a majority of the Court rejected the argument that the right to same sex marriage is a fundamental right “deeply rooted in this Nation’s history.” (7 NY3d at 362.) The Court reasoned that the right to marry a person of the same sex “has not even been asserted until relatively recent times.” (Id.)
If the right to enter into a same sex marriage is not considered fundamental, the right to avoid stigmatization as a sex offender where defendant has not engaged in any express sexual conduct most certainly cannot rise to this status. Sex offender registra *843 tion statutes did not become widespread before the 1990’s; it can hardly be claimed that the rights implicated by SORA are “deeply rooted in this Nation’s history.”
With the exception of Bell, the authorities relied upon by petitioners to support the application of strict scrutiny all concern procedural, rather than substantive, due process.[10] To the court’s knowledge, Bell is the only case in any jurisdiction that has applied the strict scrutiny standard to a challenge to a sex offender statute’s constitutionality. The court concurs with every other court confronting the issue that the appropriate standard for determining the constitutionality of SORA is whether the statute bears a rational relationship to a legitimate governmental objective.
E. The Rational Relationship Test
The Court of Appeals has articulated the rational basis test as follows:
“The rational basis standard of review is ‘ “a paradigm of judicial restraint.” ’ On rational basis review, a statute will be upheld unless the disparate treatment is ‘so unrelated to the achievement of any combination of legitimate purposes that ... [it is] irrational.’ Since the challenged statute is presumed to be valid, ‘[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . whether or not the basis has a foundation in the record.’ Thus, ‘ “those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.” ’
“Indeed, courts may even hypothesize the Legislature’s motivation or possible legitimate purpose. Thus, ‘the State has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.’ ” (Affronti v Crosson, 95 NY2d 713, 719 *844 [2001] [citations omitted]; see also Hernandez v Robles, 7 NY3d at 367.)
“Legislative enactments are entitled to ‘a strong presumption of constitutionality. ’ ‘While the presumption is not irrefutable, parties challenging a duly enacted statute face the initial burden of demonstrating the statute’s invalidity “beyond a reasonable doubt.” ’ ” (Dalton v Pataki, 5 NY3d 243, 255 [2005] [citations omitted]; accord People v Walker, 81 NY2d 661, 668 [1993].)
When applying the rational relationship test, the court must not substitute its judgment for that of the Legislature.
“[T]he traditional equal protection test as expressed in Dandridge v Williams (397 US 471, 485) [is,] ‘[i]n the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some “reasonable basis,” it does not offend the Constitution simply because the classification “is not made with mathematical nicety or because in practice it results in some inequality.” ’ The decisions of our court have adopted the same test. . . .
“ ‘[E]very line drawn by a legislature leaves out some that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function.’ ” (Montgomery v Daniels, 38 NY2d 41, 61, 64 [1975] [citations omitted].)
Although any legislative history indicating the basis for adopting a law is relevant, it is not necessary to the court’s analysis of a statute under the rational relationship test. As the Court of Appeals observed in Port Jefferson Health Care Facility v Wing (94 NY2d 284, 290-291 [1999]):
“Under the rational basis standard, the Legislature, in creating a classification, ‘need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.’
“Two principles flow from the proposition that any reasonably conceivable state of facts provides a sufficient rational basis to sustain a classification. First, ‘it is entirely irrelevant for constitutional purposes whether the conceived reason for the chai *845 lenged distinction actually motivated the legislature.’ Thus, [t]he legitimate purpose justifying the provision need not be the primary purpose of the provision . . . and, indeed, a court may even hypothesize the motivations of the State Legislature to discern any conceivable legitimate objective promoted by the provision under attack.’ ” (Citations omitted.)
Petitioners seek to avoid the import of these well-established rules by arguing that SORA is not unconstitutional on its face, but only as applied to them. It is clear, however, that simply labeling a challenge “as applied to” does not in any way alter the presumption of constitutionality. Nor does it affect the burden on petitioners to show that requiring them to comply with the requirements of SORA is not rationally related to any legitimate governmental objective.
In People v Thompson (83 NY2d 477 [1994]), the Court of Appeals considered the constitutionality of mandatory sentences for drug offenses, as applied to defendant. Employing the rational relationship test, the Court held that defendant failed to meet her burden of showing that there was no rational basis for the Legislature to mandate a minimum sentence of 15 years to life for a 17-year-old defendant convicted of selling drugs. Although the majority agreed with the dissenters that the Rockefeller drug laws were overly harsh, it ruled that it was for the Legislature, not the judiciary, to make policy choices. (83 NY2d at 484-488.)
Other courts similarly have evaluated “as-applied” challenges to the constitutionality of a statute the same way as facial challenges. (See People v Oyola, 215 AD2d 597 [2d Dept 1995] [statute permitting victim’s statement at sentencing served legitimate state interest and its application did not violate defendant’s constitutional rights]; Matter of Passucci v Town of W. Seneca, 151 AD2d 984 [4th Dept 1989] [petitioner met burden of proving beyond a reasonable doubt that zoning ordinance was unconstitutional as applied to him]; Town of Huntington v Park Shore Country Day Camp of Dix Hills, 61 AD2d 1030 [2d Dept 1978] [presumption of validity and burden of proving invalidity beyond a reasonable doubt operative where constitutionality of statute challenged as applied].)
The cases relied upon by petitioners do not support the use of any lesser standard to judge a challenge to the constitutionality of a statute as applied to a particular party. Britell v United *846 States (204 F Supp 2d 182 [D Mass 2002]) was reversed by the Federal Circuit Court of Appeals in Britell v United States (372 F3d 1370, 1383 [2004]), which rejected a case-by-case analysis of the application of a statute that has a rational basis. The statement in Janklow v Planned Parenthood, Sioux Falls Clinic (517 US 1174, 1175 [1996]) that “a facial challenge may be more difficult to mount than an as-applied challenge” is dicta commenting on dicta in United States v Salerno (481 US 739, 745 [1987]).[11]
F. Application of the Rational Relationship Standard
The challenged provisions of SORA undoubtedly pass constitutional muster under the rational relationship test.[12] The legislative history of JWA reflects that Congress intentionally included kidnapping and unlawful imprisonment of a minor in the crimes subject to registration requirements and was well aware of the connection between child abduction and the risk of sexual abuse. Thus, Senator Durenberger from Minnesota observed (139 Cong Rec S6840-02, 86864 [May 28, 1993], reprinted in 1993 WL 181792):
“Two-thirds of reported nonfamily abductions involve sexual assault. Of the 2.4 million reported cases of child abuse in 1989, 380,000 involved sexual abuse . . . The Justice Department has reported that over 85 percent of nonfamily abductions involved force and over 75 percent involved a weapon. Of the homicides that occur from stranger abductions, almost 40 percent involved rape or another sexual offense, and those are only the cases in which the circumstances were known . . . Under the Jacob Wetterling bill, the type of crimes that would trigger the registration requirement include the kidnaping or false imprisonment of a minor . . . .”
*847 Representative Ramstad of Minnesota similarly commented that JWA was needed to establish a national registration system for child abductors and child molesters. (140 Cong Rec H2510-06 [Apr. 20, 1994]; see also Report by Comm on Judiciary, HR Rep No. 103-392, 103rd Cong, 1st Sess [1993] [referring to a 1990 study by the Department of Justice finding that two thirds of reported nonfamily abductions involved sexual assault].)
This legislative history makes clear that Congress recognized the link between kidnapping and unlawful imprisonment of a minor and the purposes served by JWA. The rational link between kidnapping and unlawful imprisonment of a minor and the danger of sexual abuse also has been recognized by many courts. In People v Fuller (324 Ill App 3d 728, 756 NE2d 255 [1st Dist 2001]), defendant was convicted of aggravated kidnapping for stealing a van in which two young children were passengers. The defendant never touched the children. When defendant was asked by the police what he planned to do with the children, he said he was going to find a hotel room and ask the female child if she had any friends.
Fuller rejected defendant’s argument that it was unfair to stigmatize him as a sex offender when his crime was not sexually motivated. The court reasoned:
“While the term ‘sex offender’ may carry a stigma, there is little doubt that the offense of kidnaping a person under 18 is intended to trigger the Registration Act. While defendant did not commit what is generally labeled a sexually oriented offense, such as rape, sexual assault or pimping, the law clearly identifies aggravated kidnaping of a person under 18 as a ‘sex offense.’ It is particularly disingenuous for the defendant to argue that there is no rational relationship between the kidnaping of a child and the purpose of protecting children from the increasing incidence of sexual assault and sexual abuse. The most obvious connection between the offenses [subject to registration] and the purpose of the Registration Act is that kidnaping or unlawful restraint of a minor is often a precursor offense to juvenile pimping or exploitation of a child, which are, indisputably, within the purview of the Registration Act’s purpose. In defendant’s own case, the arresting police officer testified that when the officer asked defendant what he planned to do with chil *848 dren, defendant ‘stated he was going to find a hotel room and ask the girl if she had any friends.’ This statement, eerily suggestive of the nature of defendant’s plans for the children, in conjunction with defendant’s conduct in failing to release the children themselves support the logical nexus between the act of kidnaping a child and the very real possibility of subsequent sexual exploitation of that child.” (324 Ill App 3d at 733-734, 756 NE2d at 260 [citations omitted].)
Other courts have adopted the same rationale. (See In re Phillip C., 364 Ill App 3d 822, 847 NE2d 801 [1st Dist 2006] [regardless whether there is any sexual evidence in a particular case, requiring persons who kidnap a minor to register furthers the interests of the Illinois Registration Act]; State v Sakobie, 165 NC App 447, 598 SE2d 615 [2004] [rejecting challenge to constitutionality of sex offender statute as applied to defendant who kidnapped child where no evidence of any sexual misconduct]; State v Brown, 273 Wis 2d 785, 680 NW2d 833 [2004] [Legislature rationally could make child abduction subject to registration because isolating child in a secluded place provides the opportunity for sexual abuse with substantially less fear of detection]; see also Gunderson v Hvass, supra [upholding Minnesota statute requiring registration of persons convicted of nonsexual offenses];[13] but see State v Reine, 2003 WL 77174, 2003 Ohio App LEXIS 52 [Ct App 2d Dist 2003]; State v Barksdale, 2003 WL 77115, 2003 Ohio App LEXIS 46 [Ct App 2d Dist 2003]; Robinson v State, 804 So 2d 451 [Fla Dist Ct App 4th Dist 2001], affd 873 So 2d 1205 [2004]; Raines v State, 805 So 2d 999 [Fla Dist Ct App 4th Dist 2001]; State v McClellan, 2002 WL 31160074, 2002 Ohio App LEXIS 5208 [Ct App 10th Dist 2001].)
JWA requires all states to make kidnapping and unlawful imprisonment of a minor subject to registration requirements. If Congress had a reasonable basis for requiring child abductors to register as sex offenders, it necessarily follows that legislá *849 tion intended to bring New York into compliance with JWA shares that basis.
Both Bell and Moi held that SORA was only intended to address offenses with a sexual element and not child abductions. They reach this conclusion by relying solely upon the title of the New York statute and legislative memoranda in support of SO-RA’s adoption. This cabined reading of SORA, however, flies in the face of established rules of statutory construction and ignores the unequivocal statement in section 1 of SORA that the purpose of the law is to conform New York law to the requirements of JWA.
There is no merit to the claim that the title of SORA indicates the Legislature’s intent to make the scope of SORA less than that of JWA. “Sex offense” is defined by SORA to include kidnapping and unlawful imprisonment of a minor. The use of the word “sex offender” in SORA’s title is a reference to all offenses designated as “sex offenses.” It does not evince any intention on the Legislature’s part to limit the offenses subject to SORA.
In any event, the law is clear that the title of a statute has no substantive significance. McKinney’s Consolidated Laws of NY, Book 1, Statutes § 123 provides: “The title of a statute may be resorted to as an aid in the ascertainment of the legislative intent only in case of ambiguity in meaning, and it may not alter or limit the effect of unambiguous language in the body of the statute itself.” (See Rivers v Sauter, 26 NY2d 260, 262 [1970]; People v English, 242 AD2d 940 [4th Dept 1997]; National Assn. of Ind. Insurers v State of New York, 207 AD2d 191, 199 [2d Dept 1994], affd 89 NY2d 950 [1997].)
Bell’s and Moi’s reliance upon SORA’s legislative history also is misplaced. While several of the memoranda submitted in support of SORA do refer only to crimes with an express sexual element, many others also allude to child abduction and the fact that SORA is intended to comply with JWA. A memorandum in support of SORA legislation submitted by Senator Skelos, the sponsor of the bill, notes that, due to JWA’s mandate, all states are required to adopt a sex offender registry “or risk losing valuable federal grant monies.” (Revised Senate Introducer Mem in Support, Bill Jacket, L 1995, ch 192.) The memorandum further observes that “[t]his proposal will. . . provide law enforcement with a valuable tool in the fight against child abductions and sex crimes.” (Id.)
A letter to the Governor in support of the SORA bill submitted by Assemblyman Feldman, its sponsor in the Assembly, *850 similarly states: “The proposal meets the federal condition for state eligibility for [federal] funding. Those requirements include . . . offenses involving . . . kidnaping and unlawful imprisonment of a minor . . . Unlawful imprisonment which applies only to a minor in the bill is required by federal law.” (Letter from Assemblyman Daniel L. Feldman, July 7, 1995, at 3, Bill Jacket, L 1995, ch 192.)
Other material in the Bill Jacket for SORA reflects the Legislature’s intent to conform to JWA’s requirements. The Division of Budget report on the SORA notes: “Enactment of this bill will bring the State of New York into compliance with [JWA]. Failure to comply with such Federal requirements would jeopardize $2.8 million in [federal] monies beginning in fiscal year 1998.” (Budget Report on Bills, July 25, 1995, at 4, Bill Jacket, L 1995, ch 192; see also Letter from Mark Bonaquist, Counsel to State Commn of Correction, July 14, 1995, at 2, Bill Jacket, L 1995, ch 192 [“(The) bill also responds to a Federal mandate, the [JWA], which requires states to adopt a sex offender registry ... to avoid losing Federal grant monies”]; Press Release by Governor, June 14, 1995, at 2, Bill Jacket, L 1995, ch 192 [quoting Senator Skelos, “Our number one concern is to protect children and all potential victims from sex offenders and abductors”].)[14]
Even if the legislative history did not so clearly manifest the Legislature’s intent to make SORA coextensive with JWA, the Court of Appeals repeatedly has cautioned against reliance upon legislative history where the terms of a statute are unambiguous. As the Court observed in Sega v State:
“Claimants . . . argue that the legislative history indicates that [the statute] and its predecessor were intended to apply to private land only. Their argument, at most, does nothing more than urge ambiguity where none exists. Generally, a statute is to be construed according to the ordinary meaning of its words, and resort to extrinsic matter is inappropriate when the statutory language is unambiguous and the meaning unequivocal. While legislative *851 intent is the great and controlling principle, it should not be confused with legislative history, as the two are not coextensive. Inasmuch as the legislative intent is apparent from the language of [the statute], there is no occasion to consider the import, if any, of the legislative memorandum.” (60 NY2d 183, 190-191 [1983] [citations omitted]; see also People v Bloomfield, 6 NY3d 165, 170 [2006] [“Where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning”]; accord People v Robinson, 95 NY2d 179, 182 [2000]. )
The petitioners’ entire argument that the Legislature did not intend SORA to apply to the challenged offenses thus rests upon the title of the statute and selected legislative memoranda, neither of which can vary the unequivocal language in the statute. The fallaciousness of petitioners’ reading of SORA is revealed by the following hypothetical. Suppose Jacob Wetter-ling’s abductor was found but Jacob remained missing and there was no evidence of any sexual contact between Jacob and his kidnapper. According to petitioners, the application of the Jacob Wetterling Act to Jacob Wetterling’s own abductor would be unconstitutional, absent proof of any sexual component. Neither Congress when it adopted JWA nor the New York State Legislature when it enacted SORA could have intended such an absurd result. (See Matter of Medical Socy. of State of N.Y. v State of N.Y. Dept. of Health, 83 NY2d 447, 451-452 [1994].)
JWA expressly makes the challenged offenses subject to registration. SORA, adopted to comply with the federal mandate, explicitly includes the challenged offenses within its reach.
The Legislature’s intent to conform to the requirements imposed upon the states by JWA could not be more clearly expressed. The fact that New York State receives full funding from the federal government corroborates that the Legislature meant the offenses subject to SORA’s registration requirements to be coextensive with those defined as “sex offenses” by JWA.
Petitioners’ complaint that they are being stigmatized by being labeled sex offenders ignores the inconvenient reality that they are sex offenders because they have engaged in conduct that creates a risk of sexual abuse. The Penal Law is replete with provisions criminalizing risk-creating conduct. (See e.g. Penal Law §§ 120.20, 120.25 [reckless endangerment]; § 145.25 *852 [reckless endangerment of property]; § 240.08 [inciting to riot]; § 240.45 [1] [criminal nuisance in the second degree]; § 240.50 [1]; § 240.55 [1] [falsely reporting an incident]; § 260.10 [endangering the welfare of a child]; § 270.10 [creating a hazard].)
Many other statutes implicitly punish behavior that creates a risk to public safety, even absent any actual injury. For example, section 1192 (2) of the Vehicle and Traffic Law makes it illegal to drive with more than 0.08% blood alcohol, regardless of whether defendant’s driving actually is affected by the consumption of alcohol. By contrast, section 1192 (3) of the Vehicle and Traffic Law, so called “common-law intoxication,” requires that defendant’s driving abilities substantially be impaired by the consumption of alcohol. Both sections are punishable by up to one year in jail. Clearly, the Legislature determined that driving with 0.08% blood alcohol creates a risk of harm comparable to driving while actually affected by alcohol.
Risk-creating behavior also is an aggravating factor for many crimes. Thus, robbery in the third degree becomes robbery in the second degree when defendant is aided by another person actually present or displays what appears to be a weapon. These elements elevate the degree of robbery precisely because they enhance the risk that a victim will be killed or injured in the course of a robbery.
Under Penal Law § 70.02 (1), several crimes with no express element of actual violence are included within the definition of “violent felony offense.” (See e.g. Penal Law § 140.25 [1] [a], [c], [d] [burglary in the second degree]; § 265.03 [criminal possession of a weapon in the second degree]; § 265.14 [criminal sale of a firearm]; § 240.60 [5], [6] [falsely reporting an incident in the first degree].) A defendant convicted of a violent felony offense or second violent felony offense is subject to an increased sentence of imprisonment (Penal Law §§ 70.02, 70.04).
No one questions that the Legislature has the right to treat offenses that create a risk of violence as violent felony offenses. A defendant convicted of criminal possession of a weapon in the second degree cannot argue that Penal Law § 70.02 (1) is unconstitutional as applied to him because he never actually engaged in an act of violence. If the Legislature lawfully may impose enhanced criminal sanctions on defendants who create a risk of violence, it undoubtedly has the power to make defendants who create a risk of sexual abuse subject to registration requirements that are considered only civil in nature.
*853 The holdings in Bell and Moi were based on the court’s determination that there is no rational connection between the challenged offenses and the purposes of SORA where no sexual component is alleged. That conclusion, however, fails to take into account that it is for the Legislature, not the judiciary, to determine whether making kidnapping and unlawful imprisonment of a minor subject to SORA serves the public interest.
Moreover, Moi and Bell would give defendants convicted of kidnapping or unlawful imprisonment of a minor a right to an evidentiary hearing nowhere afforded by statute. Thus, both decisions provide that, whenever a defendant who is convicted of kidnapping or unlawful imprisonment challenges the constitutionality of SORA, the court must make an individual determination whether there is a rational basis for requiring defendant to register as a sex offender. Moi suggests that this inquiry take into account “surrounding facts and circumstances, including the defendant’s prior criminal history, sexual history, psychological history, and the nature and characteristics of the victim.” (8 Misc 3d 1012[A], 2005 NY Slip Op 51068[U], *14.)
Significantly, the Legislature did provide for such a fact-specific inquiry to be made where a defendant is convicted of unlawful surveillance. Correction Law § 168-a (2) (e) provides that a defendant may move for an exemption from SORA requirements if “the trial court, having regard to the nature and circumstances of the crime and to the history and character of the defendant, is of the opinion that registration would be unduly harsh and inappropriate.” The Legislature’s failure to carve out a similar exception for kidnapping and unlawful imprisonment is further confirmation that SORA was intended to apply to these offenses, regardless of their particular facts. (Coleman v City of New York, 91 NY2d 821, 823 [1997].)
The court declines to ignore the unambiguous language of SORA or to create by judicial fiat a procedure for determining whether a defendant convicted of kidnapping or unlawful imprisonment of a minor should be subject to SORA. If petitioners are unhappy with being stigmatized as sex offenders, their remedy is to seek a change in the statute or to refrain from committing crimes that create a risk of sexual abuse.
*854 Treating kidnapping and unlawful imprisonment of a minor as sex offenses subject to registration and notification is rationally related to the legitimate governmental objectives underlying the adoption of JWA and SOBA. Petitioners have failed to meet their burden of showing beyond a reasonable doubt that SOBA is unconstitutional as applied to them. Petitioners’ applications to be exempted from the registration requirements of SOBA accordingly are denied.[15]

. L 1995, ch 192, eff Jan. 21, 1996, codified at Correction Law § 168-a et seq.

. With the exception of petitioner Glover, these "challenges arose in the context of an original SORA determination. Glover’s application was made in connection with a redetermination of his SORA level, pursuant to the stipulation reached in Doe v Pataki (96 Civ 1657 [DC] [SD NY 2004]).

. Correction Law § 168-a (2) (a) (i).

. Correction Law § 168-a (2) (a) (i).

. <http://www.jwf.org>

. The Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program (42 USC § 14071, as amended by Megan’s Law, Pub L 104-145, 110 US Stat 1345). In its original form, JWA imposed an obligation on states to implement a sex offender and crimes against children registry. The 1996 amendments to JWA, commonly known as Megan’s Law, required states to establish community notification systems.

. The guidelines were amended in 1997 but retained this language. (62 Fed Reg 39009 [1997], reprinted in 1997 WL 403032.)

. Kidnapping is defined as abducting another person (Penal Law § 135.20). Unlawful imprisonment is defined as restraining another person under circumstances which expose the latter to a risk of serious physical injury (Penal Law § 135.10).

. Correction Law § 168-h, as amended by L 2006, ch 1, § 3. Judge Chin of the United States District Court for the Southern District of New York has ruled that the new periods for registration cannot be applied retroactively to the class of plaintiffs covered by the Doe v Pataki stipulation. (Doe v Pataki, 427 F Supp 2d 398 [SD NY 2006].)

. Paul v Davis (424 US 693 [1976]), cited by Bell and petitioners to support a claim of governmental defamation, primarily involved a claimed denial of procedural due process. To the extent that the Court considered substantive due process, it held that public disclosure of respondent’s arrest record did not violate any fundamental right. (424 US at 712-713.)

. In any event, the distinction between facial and as-applied challenges has been called into question. (See Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv L Rev 1321, 1336-1337 [2000] [“Facial challenges are not sharply categorically distinct from as-applied challenges to the validity of statutes ... A court must always begin with a case, framed by concrete facts including an allegation of harm to a specific plaintiff caused by an identified defendant”].) Professor Fallon’s article was cited by the Court of Appeals in People v Stuart (100 NY2d 412, 425 [2003]), where the Court noted that there is some disagreement on the subject of facial versus as-applied challenges.

. Although petitioners claim that the application of SORA to them violates both their due process and equal protection rights, the rational relationship test is the same for both types of challenges. (See Hernandez v Robles, 7 NY3d 338 [2006].)

. While these applications were pending, the connection between unlawful imprisonment and the objectives of SORA played out in the real world. When the police were investigating the recent gruesome rape/murder of Imette St. Guillen in New York City, a retired New York City detective who now works as a criminal profiler told the New York Times “you’re looking for people with prior arrest records . . . Not just sexually related aggressive behavior, but also unlawful imprisonment.” (New York Times, Mar. 2, 2006, at B6, col 6.)

. JWA provides for decreased funding to any state that does not adopt a registration program. According to John Amodeo, Assistant Deputy Counsel to the New York State Office of Court Administration, New York receives full funding under JWA. The federal government therefore considers New York’s sex offender statute to be in compliance with JWA’s mandate that “sex offenses” include kidnapping and unlawful imprisonment of a minor by a nonparent.

. Because the court has determined that it is inappropriate to consider the facts of a particular case where defendant is convicted of a SORA offense, it does not reach the People’s alternative argument as to the presence of a sexual component in petitioners’ crimes. The absence of an express sexual aspect, however, affects the assessment of points against petitioners under the Board of Examiners of Sex Offenders Guidelines.